# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of: | ) |
| | ) |
| The residence located at 1138 South Serrano | )    Case No. **2:21-MJ-04789** |
| Avenue, Unit 202, Los Angeles, California | ) |
| (**"TARGET RESIDENCE 2"**). | ) |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**See Attachment A-2**

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

**See Attachment B**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of the Target Offenses:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to commit wire fraud and bank fraud. |
| 18 U.S.C. § 1343 | Wire fraud. |
| 18 U.S.C. § 1344 | Bank fraud. |
| 18 U.S.C. § 1956(h) | Money laundering conspiracy. |

The application is based on these facts:

**See attached Affidavit**

☒ Continued on the attached sheet.

/s/ Young Oh
_____
*Applicant's signature*

FBI Special Agent Young Oh
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:_____

_____
*Judge's signature*

City and state: Los Angeles, California    Hon. Rozella A. Oliver, U.S. Magistrate Judge
_____
*Printed name and title*

AUSA: Gregory Bernstein (x3183)

## **Attachment A-2**

#### **PREMISES TO BE SEARCHED**

The premises is located at 1138 South Serrano Avenue, Unit 202, Los Angeles, California ("**TARGET RESIDENCE 2**"), which is an apartment building located east off of South Serrano Avenue, Los Angeles, California. There is white lettering "1138" on the front of the property. **TARGET RESIDENCE 2** is accessible directly from Serrano Avenue. **TARGET RESIDENCE 2** includes any area, including vehicles, within the curtilage of **TARGET RESIDENCE 2**. **TARGET RESIDENCE 2** is depicted below:



**ATTACHMENT B**

## I.   ITEMS TO BE SEIZED

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of conspiracy to commit wire fraud and bank fraud (18 U.S.C. § 1349), wire fraud (18 U.S.C. §1343), bank fraud (18 U.S.C. § 1344), and conspiracy to commit money laundering (18 U.S.C § 1956(h)) (the "Target Offenses"), namely:

a.   Records and documents relating to prepaid cards, such as prepaid credit, debit, and gift cards,

b.   Records and documents relating to Visa or Visa cards, Costco or Costco cards, or Simon Mall or Simon cards, or any other credit or prepaid debit card,

c.   Merchant machines and credit card swiping devices,

d.   Credit and debit cards, including prepaid debit cards,

e.   Bank, loan, credit, and financial transaction records and correspondences,

f.   Records, programs, and items relating to the counterfeiting or manipulation of documents and identifications, such as the cutting-and-pasting of signatures, letterheads, watermarks, and seals, including the altered or counterfeited information itself,

g.   Ledgers and records of personal identifying information, including names, dates of birth, social security numbers, addresses, and bank account numbers, and credit card numbers,

h.   Personal identifying information of individuals other than those residing at the **TARGET RESIDENCES**, including social security numbers, other identifying numbers, dates of birth, credit, debit card, or other account information, PINs, credit reports, and

bank or other financial institution information, and records relating to such information,

      i.   Identification cards, whether genuine or fake,

      j.   Records relating to wealth and the movement of wealth, such as tax returns and forms, crypto-currency accounts and transfers, other digital wealth storage and transfer methods including PayPal and Venmo, money orders, brokerage and financial institution statements, wire transfers, currency exchanges, deposit slips, cashier's checks, transactions involving prepaid cards, and/or other financial documents related to depository bank accounts, lines of credit, credit card accounts, real estate mortgage initial purchase loans or loan refinances, residential property leases, escrow accounts, the purchase, sale, or leasing of automobiles or real estate, or auto loans, and investments, or showing or referring to purchases or transactions for more than $1,000,

      k.   Records or items containing indicia of occupancy, residency or ownership of any location or vehicle being searched, such as keys, rental agreements, leases, utility bills, identity documents, cancelled mail, and surveillance video,

      l.   Mail matter and shipping packages, opened or unopened, including mail matter not addressed to or from the **TARGET RESIDENCES,**

      m.   Currency, money orders, and casino chips with a value in excess of $1,000, including the first $1,000 if more than $1,000 is found, precious metal coins and bullion, and prepaid debit or credit cards,

      n.   Cryptocurrency and related records and items, such as those referring or relating to public or private keys or addresses, or cryptocurrency wallets or their parts, including "recovery seeds"

or "root keys" which may be used to regenerate a wallet. Seizure of the cryptocurrency and wallets will be accomplished by transferring or copying them to a public cryptocurrency address controlled by the United States, or by restoring them onto computers controlled by the United States.

o.   Documents and keys relating to public storage units, rental cars, prepaid cellular telephones, safety deposit boxes, Commercial Mail Receiving Agencies, virtual offices, or receiving mail at someone else's address, or holding or renting assets or items under someone else's name,

p.   Documents and records showing electronic and telephone contacts and numbers called or calling, such as SIM cards, address books, call histories, telephone bills, and ICQ, Telegram, and email addresses,

q.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

r.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence,

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses,

Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software,

           iii. evidence of the attachment of other devices,

           iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device,

           v.   evidence of the times the device was used,

           vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device,

           vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it,

           viii.   records of or information about Internet Protocol addresses used by the device,

           ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

    2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

    3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units, desktop, laptop,

notebook, and tablet computers, personal digital assistants, wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones, digital cameras, gaming consoles (including Sony PlayStations and Microsoft Xboxes), peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media, related communications devices, such as modems, routers, cables, and connections, storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS), and security devices.

II. **SEARCH PROCEDURE FOR DIGITAL DEVICES**

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location. The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant. The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within

the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above,

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data,

c.    Any magnetic, electronic, or optical storage device capable of storing digital data,

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device,

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device,

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device, and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumbs and/or fingers of **Kibong Suk, Sang Jun Cho,** and **Hwan Kim** onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed, and (2) hold the device in front of the face of that person with his eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device. In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989), specifically, law enforcement may use no more than objectively

xiii

reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Young Oh, being duly sworn, declare and state as follows:

### PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of applications for warrants to search the following residences and vehicles, collectively referred to as the **TARGET RESIDENCES** and **TARGET VEHICLES**:

a.   **Kibong Suk**'s ("**Suk**") residence at 2772 Wyckersham Place, Fullerton, California ("**TARGET RESIDENCE 1**"), described in Attachment A-1.

b.   **Sang Jun Cho**'s ("**Cho**") residence at 1138 South Serrano Avenue, Unit 202, Los Angeles, California ("**TARGET RESIDENCE 2**"), described in Attachment A-2.

c.   The 2019 Black Lexus GX460 SUV bearing California license plate number 8HGS857 and VIN JTJBM7FX1K5213164, that **Cho** drives ("**TARGET VEHICLE 1**"), described in Attachment A-3.

d.   **Hwan Kim**'s ("**Kim**") residence at 414 South Serrano Avenue, Los Angeles, California ("**TARGET RESIDENCE 3**"), described in Attachment A-4.

e.   The 2005 Green GMC Yukon bearing California license plate 5MKG752 and VIN 1GKEC13V15R139331, registered to **Kim** ("**TARGET VEHICLE 2**"), described in Attachment A-5.[1]

2.   The requested warrants seek authorization to search for and seize evidence, fruits, and instrumentalities of conspiracy to commit

---

[1] For clarity, in this affidavit, the target facilities are capitalized and bold (e.g., **TARGET RESIDENCE 1**), and the targets (e.g., **Suk, Kim**, and **Cho**) are lowercase and bold. Moreover, for witness safety purposes, confidential sources are referred to using male pronouns, regardless of identity.

1

wire fraud and bank fraud (18 U.S.C. § 1349), wire fraud (18 U.S.C. § 1343), bank fraud (18 U.S.C. § 1344), and conspiracy to commit money laundering (18 U.S.C. § 1956(h)) (the "Target Offenses"), as described in Attachment B.

3.    For the reasons described below, there is probable cause to believe that the **TARGET VEHICLES** are located in the Central District of California.

4.    Attachments A-1 through A-6, and Attachment B, are incorporated into this affidavit by reference.

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, as well as reasonable conclusions that I have drawn from the foregoing sources of information.

6.    This affidavit is intended to only show that there is probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.

7.    Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only. Further, all dates and amounts are approximations, and the words "on or about" and "approximately" are omitted for clarity.

8.    Many of the recorded conversations involving the Target Subjects were in Korean. This affidavit provides draft English translations of the Korean conversations.

<u>**BACKGROUND OF AFFIANT**</u>

7.    I am a special agent with the Federal Bureau of Investigation ("FBI") and have been so employed since July 2004. I am

2

currently assigned to a Los Angeles Field Division White Collar Crimes Squad, which is responsible for investigating financial institution fraud, including bank fraud and wire fraud. Prior to working for the FBI as a special agent, I was employed as a field auditor with the Department of Real Estate.

8.    As a special agent with the FBI, I have investigated financial crimes, including wire fraud, money laundering, bank fraud, and financial institution fraud. I have participated in numerous aspects of criminal investigations, including interviews, reviewing evidence, conducting physical and electronic surveillance, and the execution of search and arrest warrants. I have received advanced training in investigating crimes, such as bank fraud, money laundering, and other financial frauds. In addition, I attended New Agent Training at the FBI Academy in Quantico, Virginia where I received extensive instructions in FBI core mission areas, legal authorities, laboratory techniques, and criminal intelligence.

## SUMMARY OF PROBABLE CAUSE

9.    **Kibong Suk** ("**Suk**"), **Sang Jun Cho** ("**Cho**"), and **Hwan Kim** ("**Kim**") have and are participating in a scheme to "bust-out" credit cards.

10.   In a bust-out scheme, the fraudster uses the full balance of another individual's credit card to buy prepaid debit cards ("prepaid cards"), then makes a bogus payment to the credit card company from a closed bank account or bank account with insufficient funds, causing the debt balance of the credit card to temporarily return to zero. Then, before the credit card company realizes that the debt was paid off with an account that had insufficient funds, the fraudster uses the balance of the individual's credit card to buy

3

more prepaid cards, never with the intent to repay the credit card debt. Next, the fraudster sells the prepaid cards, which were fraudulently purchased with the bust-out credit card, on the black-market for a profit ("black-market prepaid cards").

11.  In this case, the owners of the credit cards often participated in the scheme and allowed the bust-out fraudsters to use their credit cards in exchange for cash.

12.  **Suk** and **Cho** have used and are using bust-out credit cards to purchase prepaid cards, then selling those prepaid cards on the black market. Over the past decade, both **Suk** and **Cho** sold hundreds of thousands of dollars of black-market prepaid cards to Confidential Source 1 ("CS1").

13.  Since CS1 began cooperating with the FBI in July 2020, CS1 has, at the FBI's direction, met with **Suk** numerous times to purchase black-market prepaid cards from **Suk. Suk** and his wife have a history of using closed bank accounts and an account with insufficient funds to make fraudulent payments on the balances of credit cards that were likely used in the bust-out scheme. Moreover, in September 2021, **Suk** called CS1 and asked if CS1 was "working again," referring to the bust-out credit card scheme and CS1's ability to purchase black-market prepaid cards. **Suk** lives at **TARGET RESIDENCE 1**.

14.  Since CS1 began cooperating with the FBI, he has purchased, at the FBI's direction, $216,800 in black-market prepaid cards from **Cho**. During that time, **Cho** has been intercepted on CS1's consensually-monitored cell phone discussing the bust-out credit card

scheme.[2] **Cho** resides at **TARGET RESIDENCE 2** and drives **TARGET VEHICLE 1**. CS1 has seen **Cho** drive **TARGET VEHICLE 1** to meet with CS1 to sell black-market prepaid cards to CS1

15.   **Kim** purchases black-market prepaid cards that were bought with bust-out credit cards. Confidential Source 2 ("CS2") has made controlled sales to **Kim** of prepaid cards that **Kim** thought were loaded with funds from bust-out credit cards, but instead were loaded with FBI operational funds. **Kim** has also been intercepted during consensually-recorded conversations with CS1 and CS2 discussing the bust-out credit card scheme and his ability to purchase black-market prepaid cards. **Kim** resides at **TARGET RESIDENCE 3** and drives **TARGET VEHICLE 2**. CS2 has met with **Kim** in front of **TARGET RESIDENCE 3** to discuss the acquisition of black-market prepaid cards.

<u>STATEMENT OF PROBABLE CAUSE</u>

16.   Based on information I obtained from confidential sources, review of bank records, physical surveillance, law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**a.   Credit card bust-out schemes**

17.   This case involves what is commonly referred to as a credit card bust-out scheme.

18.   In a bust-out scheme, the fraudster obtains a credit card, often using a fake or stolen identity and a credit privacy number

---

[2] In this affidavit, when I write that a conversation was "consensually-recorded," I mean that the confidential source, and not the target, provided consent to record the communications.

("CPN").[3] The fraudster then maxes out the available line of credit on the credit card with the intention of not repaying the debt, then discards the credit card.

19.  Often, the bust-out fraudster will make purchases with the fraudulently-obtained credit card until the card reaches its limit, then make a payment to the credit card company for the balance of the debt on the card from a bank account with nonsufficient funds (an "NSF payment"). Once the credit card zeroes out the debt, but before the credit card company realizes that the payment for the balance of the card was an NSF payment from an account with no funds, the bust-out fraudster maxes out the credit card for a second time.

20.  In some cases, individuals with credit cards in their names who need cash ("customers"), normally non-US citizens who intend to permanently leave the country, solicit the assistance of bust-out fraudsters, who help the customers fraudulently convert the customers' credit card balances to cash.

21.  Bust-out fraudsters have different ways of converting credit card limits to cash. Some will simply buy items with high resale value, such as popular electronic products like iPhones, and then sell them for cash.

22.  More sophisticated fraudsters use the bust-out credit cards to buy prepaid cards, which can be used anywhere a credit card can, but are more difficult to trace because they are prepaid and therefore require no credit check or account opening documents. Once

---

[3] "CPNs" have nine digits and look like social security numbers. Fraudsters often market CPNs to consumers with bad credit as a way to "start over" with no credit history. However, the term "CPN" is often a legitimate-sounding veneer for someone else's social security number.

the fraudster uses the bust-out credit card to buy prepaid cards, he will often sell those prepaid cards for cash at a discount on the black-market ("black-market prepaid cards").

23.   For illustration, the following is a hypothetical example of a bust-out credit card scheme:

a.   Customer 1 is a foreign citizen who needs cash and has an American Express ("Amex") card with a limit of $3,000 and no current debt balance, but intends to soon return to a foreign nation and never return to the United States.

b.   Customer 1 goes to Fraudster 1, a bust-out fraudster, who helps Customer 1 convert his credit limit to cash. Fraudster 1 instructs Customer 1 to use his Amex card to buy $3,000 in prepaid cards (thereby maxing out the Amex card) and provide those prepaid cards to Fraudster 1.

c.   Fraudster 1 subsequently uses a closed account with no funds to make an NSF "payment" to Amex for the full balance of the card, causing Amex to return the balance of Customer 1's credit card to zero. Before Amex determines that the balance payment was from a closed account, Fraudster 1 directs Customer 1 to buy another $3,000 in prepaid cards (thereby maxing out the Amex card for the second time) and provide those prepaid cards to Fraudster 1.

d.   In return, Fraudster 1 gives Customer 1 a certain amount of cash for the prepaid cards.

e.   Next, Fraudster 1 approaches Fraudster 2, who wants to purchase the $6,000 in black-market prepaid cards, that Fraudster 1 obtained using Customer 1's Amex card, at a 10 percent discount, or $5,400. Fraudster 2 can then buy $6,000 worth of goods with the black-market prepaid cards for which he only paid $5,400.

7

f.    Customer 1 therefore quickly obtains cash (though his credit will be harmed in the United States), Fraudster 1 earns $5,400 minus the amount he remits to Customer 1, Fraudster 2 makes $600, and Amex loses the entire $6,000.

24.    In this case, **Suk** and **Cho** are bust-out fraudsters, like Fraudster 1 in the hypothetical example above, as was CS2 before he began cooperating with the FBI.

25.    **Kim** is an individual who purchases black-market prepaid cards that were acquired with bust-out credit cards, like Fraudster 2 in the hypothetical example above. CS2 has made several controlled sales to **Kim** who believed that he was purchasing black-market prepaid cards (which were actually loaded with FBI operational funds).

26.    CS1 was also a black-market prepaid card buyer, and over the years, has purchased millions of dollars of black-market prepaid cards that fraudsters, including **Suk** and **Cho**, obtained with bust-out credit cards.

### b.    Confidential Source 1 ("CS1") provides information on targets

27.    CS1 has been cooperating with the FBI since June 2020 to identify and collect incriminating information on bust-out fraudsters, particularly **Suk** and **Cho**, who had been supplying CS1 with large amounts of black-market prepaid cards for years.

28.    CS1 has also been cooperating to identify and collect incriminating information on **Kim**, who has been purchasing black-market prepaid cards from other local bust-out fraudsters (whose identities are unknown to CS1).

29.    CS1 is cooperating to reduce his criminal sentencing exposure following a June 2020 FBI search warrant executed on his

residence. According to the National Crime Information Center ("NCIC"), CS1 does not have any prior convictions. At the direction of the FBI, CS1 continued to buy at a discount black-market prepaid cards from fraudsters with whom he had criminal relationships (**Suk** and **Cho**), just as CS1 had done before the search warrant was executed on his residence.

30.   From June 2020 to December 2020, the FBI directed CS1 to continue using his own cash to purchase the black-market prepaid cards from the fraudsters and keep any profits he made from the sale of his Costco cigarettes that he purchased with the prepaid cards, just as he had done before the search warrant was executed on his residence. This arrangement was necessary for CS1 to maintain his credibility within the fraud community while he reported on the bust-out fraudsters' criminal activities to the FBI.

31.   CS1 confessed to me that for the past 15 years, he had been purchasing for cash millions of dollars of black-market prepaid cards at a discount from bust-out fraudsters. CS1 stated that over the years, he purchased black-market prepaid cards from numerous fraudsters, including **Suk** and **Cho,** and that they contacted him via phone, text, and digital message application to set up meetings to sell their black-market prepaid cards to CS1.

32.   CS1 also told me that the fraudsters who sold him black-market prepaid cards used alias names to hide their true identities. Moreover, according to CS1, some of the fraudsters drove vehicles registered in other individuals' names, also to hide their true identities.

33.   During my investigation, I learned that **Suk** and **Cho** both used cell phone numbers that were subscribed in other individuals'

names to call CS1 and set up meetings to sell CS1 black-market prepaid cards.

34. CS1 has provided the following information about **Suk**:

a. According to CS1, **Suk** uses the alias name "James."

b. From June 2020 to October 2020, **Suk** sold CS1 a total of $67,000 in black-market prepaid cards for cash at a nine percent discount.[4] CS1 purchased the prepaid cards at the direction of the FBI to report incriminating information on **Suk**.

c. **Suk** used cell number 714-561-8785 ("**Suk**'s 8785 number" or "**Suk**'s 8785 phone") to call CS1 to set up meetings to sell CS1 the black-market prepaid cards. I learned from business records that **Suk**'s 8785 number is a T-Mobile number subscribed to Jay Lee at 846 South Brookhurst Street, Anaheim, California. The relationship between **Suk** and Jay Lee is currently unknown.

35. CS1 has provided the following information about **Cho**:

a. According to CS1, **Cho** used the alias name "Sean."[5] On March 26, 2021, CS1 confirmed to me that a DMV photograph of **Cho** was the same person CS1 knows as "Sean."

b. From June 2020 to October 2020, **Cho** sold to CS1 a total of $216,800 in black-market prepaid cards for cash at a 10 percent discount. CS1 purchased the prepaid cards at the direction of the FBI to report incriminating information on **Cho**.

---

[4] The values of the black-market prepaid cards described in this affidavit are the face values of the cards, not the amount that the confidential source paid for the cards after the discount was applied. Amounts in this affidavit are rounded down to the nearest dollar.

[5] For clarity, throughout this affidavit, I use the names **Suk** and **Cho**, though CS1 referred **Suk** and **Cho** as James and Sean, respectively.

c.   **Cho** used cell number 213-399-0125 ("**Cho**'s 0125 number" or "**Cho**'s 0125 phone") to call CS1 to set up meetings to sell CS1 black-market prepaid cards. Phone records show that **Cho**'s 0125 number is an AT&T number subscribed to Soo Rim Lee at 2029 McGarvey Street, Fullerton, California, but that Seong Yeon Kim, at 642 East 62nd Street, Unit D, Los Angeles, California, pays the cell phone bills. The relationships between **Cho** and the two individuals associated with **Cho**'s 0125 number, Soo Rim Lee and Seong Yeon Kim, are currently unknown.

36.   CS1 has provided the following information about **Kim**:

a.   CS1 has known **Kim** for over 10 years.

b.   **Kim** also purchases discounted black-market prepaid cards from different fraudsters.

c.   **Kim** uses the prepaid cards to buy wholesale cigarettes at Costco Warehouse stores. **Kim** sells his cigarettes at a small corner store in downtown Los Angeles on Third Street.

d.   CS1 does not know which fraudsters supply **Kim** with the black-market prepaid cards. CS1 and **Kim** do not share information about their suppliers because CS1 and **Kim** are always looking to buy more prepaid cards, so they keep their suppliers to themselves (i.e., **Kim** considers CS1 to be a competitor).

e.   During the investigation, **Kim** used cell phone number 213-819-6995 ("**Kim**'s 6995 number" or "**Kim**'s 6995 phone"), now a T-Mobile number, to call CS1 to complain about his fraudsters not bringing him more black-market prepaid cards for **Kim** to purchase.

f.   CS1 added that he and **Kim** have met at **TARGET RESIDENCE 3** to commiserate about how the Covid-19 pandemic shutdown was the likely cause of the low supply of black-market prepaid cards.

11

37.   I learned from business records that **Kim**'s 6995 phone is registered to **TARGET RESIDENCE 3**.

38.   According to Bank of Hope bank records, **Kim** and Sung Hee Kim ("Sung Hee"), **Kim**'s wife, have a joint bank account together ending in 7727. The bank records showed that Sung Hee has the same address as **TARGET RESIDENCE 3**. The records also list Sung Hee's employer as "American Pacific Supply."

39.   According to CS1, prior to the Covid-19 pandemic shutdown, CS1 purchased from **Suk** and **Cho**, for cash, millions of dollars of black-market Simon prepaid cards. CS1 then used the prepaid cards to purchase wholesale cigarettes from Costco stores for his cigarette business. According to CS1, **Suk** and **Cho** preferred Simon prepaid cards over other types of prepaid cards because they were able to easily purchase larger quantities of $500 and $1,000 prepaid cards from kiosks centers inside the Simon Malls without being scrutinized, and because Simon prepaid cards also had lower premium fees.

40.   However, according to CS1, during the Covid-19 pandemic lockdown, Simon Malls were closed for an extended period of time, forcing CS1's fraudsters, like **Suk** and **Cho**, to go elsewhere to purchase prepaid cards using bust-out credit cards, such as supermarkets and shopping centers, where smaller denomination prepaid cards were sold and only smaller amounts of prepaid cards could be purchased per transaction.

41.   **Suk** and **Cho** also sold black-market Costco prepaid cards to CS1 because they knew CS1 purchased wholesale cigarettes at Costco stores.

42.   While CS1 has been cooperating with the FBI, I have attempted to prove or disprove the truth of his statements on

numerous occasions. To my knowledge, CS1 has never knowingly provided false information, and I consider him to be a reliable source of information.

**c.  Confidential Source 2 ("CS2") provides information on targets**

43.  CS2 is a former professional bust-out fraudster who used fake identities and CPNs to obtain credit cards, busted out the credit cards by buying prepaid cards, and sold prepaid cards on the black market for cash.

44.  CS2 has been cooperating with the FBI for the past three years to identify and collect incriminating information on other bust-out fraudsters.

45.  CS2 has been charged for his criminal activity as a bust-out fraudster and is cooperating to reduce his sentence. During the investigation, CS2 was reimbursed for out-of-pocket expenses related to cell phone service plans he purchased at the direction of the FBI to conduct investigatory operations.

46.  According to NCIC, in 2014, CS2 was arrested for attempting to solicit prostitution, but there is no further information in NCIC on the disposition of this case. On October 4, 2021, CS2 told me that this charge was dismissed.

47.  At the direction of the FBI, CS2 contacted **Kim** to determine if **Kim** was interested in purchasing black-market prepaid cards from bust-out fraudsters. For example, on December 4, 2020, at the direction of the FBI, on a consensually-recorded line, CS2 called **Kim** for the first time and told him that CS2 received **Kim'**s phone number from someone who told CS2 that **Kim** was in the business of buying black-market prepaid cards. CS2 used this ruse to find out if **Kim** was

interested in buying the black-market prepaid cards. During the call, **Kim** expressed interest in purchasing black-market prepaid cards from CS2, even after CS2 told **Kim** that he was a professional bust-out fraudster.

48. As a result, on December 17, 2020 and April 6, 2021, at the FBI's direction, CS2 met with **Kim** inside **TARGET VEHICLE 2** parked at a Starbucks lot in Los Angeles and successfully sold a total of $4,500 in prepaid cards to **Kim,** who believed that he was purchasing black-market prepaid cards from CS2 (when in fact the cards were loaded with FBI operational funds).

49. While CS2 has been cooperating with the FBI, I have attempted to prove or disprove the truth of his statements on numerous occasions. To my knowledge, CS2 has never knowingly provided false information, and I consider him to be a reliable source of information.

   **d.   Court orders to monitor CS1's phone and track targets' phones**

50. Based on the information CS1 and CS2 provided concerning **Suk, Cho,** and **Kim,** I successfully obtained court authorizations to consensually monitor CS1's cell phone calls with **Suk, Cho,** and **Kim,** and to track the location of their phones.

51. On October 7, 2020, Chief Judge Gutierrez with the Central District of California issued a 90-day court-ordered authorization in case number CM 20-148 to conduct the consensual recording of CS1's cell phone (the "recordings") used in communicating with **Suk'**s 8785 number, **Cho'**s 0125 number, and **Kim'**s 6995 number.

52. On December 9, 2020, Magistrate Judge Charles Eick approved an initial GPS and stingray application in case number MJ 20-5955

authorizing for a 45-day period the collection of GPS and cell-site information, along with the use of a cell-site simulator, to track **Suk**'s 8785 phone, **Cho**'s 0125 phone, and **Kim**'s 6995 phone.

53. On December 23, 2020, Chief Judge Gutierrez renewed the authorization in case number CM 20-148 to consensually monitor CS1's cell phone for an additional 90 days.

54. On January 28, 2021, Chief Magistrate Judge Paul Abrams renewed the authorization in case number MJ 20-5955 for an additional 45 days to track **Suk**'s 8785 phone, **Cho**'s 0125 phone, and **Kim**'s 6995 phone.

55. On March 24, 2021, Magistrate Judge Gail Standish renewed the authorization in case number MJ 20-5955 for another additional 45 days to track **Suk**'s 8785 phone, **Cho**'s 0125 phone, and **Kim**'s 6995 phone.

### e. Suk and TARGET RESIDENCE 1

56. From June 2020 to October 2020, at the direction of the FBI, CS1 purchased, for cash, a total of $67,000 in black-market prepaid cards from **Suk** at a nine percent discount.

57. For example, on June 29, 2020, CS1 met with **Suk** inside CS1's car and purchased, for cash, $27,000 in Costco black-market prepaid cards. During that encounter, CS1 took a photograph of **Suk**'s California license plate attached to the car **Suk** drove to meet with CS1. On June 30, 2020, CS1 provided me with the photograph of **Suk**'s Hyundai, which was a white Hyundai Genesis with a California license plate bearing tag number 7JSB757 ("**Suk**'s Hyundai"). According to NCIC, **Suk**'s Hyundai was registered to **Suk** at the address of **TARGET RESIDENCE 1**.

15

58.   On September 3, 2020, CS1 met with **Suk** inside CS1's car and purchased, for cash, $9,000 in black-market prepaid cards. On the following day, I received a text message from CS1 that he purchased, for cash, $9,000 in black-market Costco prepaid cards from **Suk**. The text message also included a photograph of nine Costco black-market prepaid cards, each card reflecting a face value of $1,000 that CS1 purchased from **Suk**.

59.   On September 25, 2020, CS1 met with **Suk** inside CS1's car and purchased, for cash, $8,200 in black-market prepaid cards from **Suk**. Later, on the same day, CS1 texted me photographs of 18 Visa black-market prepaid cards CS1 purchased from **Suk**.

60.   On October 13, 2020, CS1 received a call from **Suk**, who was using **Suk**'s 8785 number. During the call, **Suk** told CS1 that he had $9,000 in black-market prepaid cards to sell, and asked CS1 to meet him that day. CS1 later sent me a text message stating that he purchased black-market prepaid cards from **Suk**. CS1 also texted me a photograph of the 10 Simon black-market prepaid cards that he purchased from **Suk**.

61.   On October 30, 2020, CS1 received a call from **Suk**, who was using **Suk**'s 8785 number. During the call, **Suk** told CS1 that he had black-market prepaid cards to sell to CS1 and asked CS1 to meet him at Coffee Bean.

62.   Subsequently, on October 31, 2020, CS1 sent me a text message that he purchased $13,000 in black-market prepaid cards from **Suk**. CS1 also texted me photographs of 20 Simon black-market prepaid cards that he purchased from **Suk**.

63.   On January 6, 2021, using cell-site simulator data, FBI surveillance located **Suk**'s 8785 phone that was emitting pings from

**TARGET RESIDENCE 1**. From December 2020 to May 2021, **Suk**'s 8785 phone continued to ping from **TARGET RESIDENCE 1**.

64.  On January 6, 2021, FBI surveillance also observed **Suk**'s Hyundai in the driveway of **TARGET RESIDENCE 1**.

65.  On August 12, 2021, T-Mobile phone records showed that **Suk**'s 8785 number made an outgoing call to CS1, which lasted one minute.

66.  On September 7, 2021, CS1 reported to me that **Suk** was still in the business of selling black-market prepaid cards. CS1 knew this because approximately one month earlier, CS1 received a phone call from **Suk**, who was using **Suk**'s 8785 number. During that call, **Suk** asked CS1 if he was "working again," referring to the bust-out credit card scheme and CS1's ability to resume purchasing black-market prepaid cards. CS1 told **Suk** that he was not buying black-market prepaid cards at the time. **Suk** then quickly ended the phone call.[6] According to CS1, for the past 10 years, **Suk** only called CS1 whenever he had black-market prepaid cards to sell to CS1.

67.  On October 4, 2021, an FBI agent surveilled **TARGET RESIDENCE 1** and saw in the driveway a white two-door 2020 Mercedes with a California license plate bearing tag number 8RFX891. According to NCIC, the vehicle was leased to **Suk** by Hyundai Motors Financial and its VIN was WDDWJ8HB4LF974809. **Suk**'s Hyundai was not seen at **TARGET RESIDENCE 1** during that surveillance operation. However,

---

[6] Notably, in or around December 2020, CS1 told his bust-out fraudsters that he was experiencing issues with his Costco membership and his ability to continue buying cigarettes from Costco, and that until he resolved the issues, he was not buying any black-market prepaid cards.

according to NCIC, as of October 5, 2021, **Suk**'s Hyundai continued to be registered to **Suk** at **TARGET RESIDENCE 1**.

   **f.    Suk and In Jung use their personal bank accounts to execute bust-out scheme**

68.    According to Hanmi Bank records, **Suk** has a joint bank account with his wife In Jung Kim ("In Jung") in account ending in 8993. According to the bank signature card for this account, dated August 9, 2016, which **Suk** and In Jung signed, the account is a joint husband-wife account. Thus, I believe that **Suk** and In Jung are husband and wife, respectively.

69.    From June 2019 to November 2019, **Suk** and In Jung's personal bank accounts at Hanmi Bank were involved in a total of $369,433 in suspicious ACH credit card payments that I believe were used to effectuate the bust-out scheme.

70.    According to Hanmi Bank records, In Jung's personal Hanmi Bank checking account ending in 0984 ("Hanmi Bank 0984") was opened on March 19, 2008, and was later closed on December 4, 2017. In Jung was the account holder and sole authorized signer on this account. The listed address for In Jung was 7702 9th Street, Apartment 5, Buena Park, California.

71.    Between June 11, 2019 and July 5, 2019, Hanmi Bank 0984, which had been closed since December 4, 2017, had 61 suspicious attempted ACH credit card payments totaling $278,269 towards American Express ("Amex"), Wells Fargo, Chase Bank, Barclaycard, Discover, Capital One, First Bankcard, Bank of America, Citi Card, Nordstrom, Sam's Club Master Card, Cardmember Services, and Walmart Master Card. Hanmi Bank identified In Jung and eight individuals -- David D. Kim, Barbara Yi, Anna Hwang, Hanmi Bank Han, Kang Young Lee, Keum N Kim,

Zio Zio USA Incorporated, and Golden Green Mountain Incorporated --
as the responsible parties involved in the attempted ACH payments
against Hanmi Bank 0984. The relationship between In Jung and those
individuals is currently unknown. However, I believe that In Jung and
**Suk** were using this closed account to make NSF payments to effectuate
the bust-out fraud they were committing on the foregoing credit card
companies. Hanmi Bank subsequently returned the ACH payments because
Hanmi Bank 0984 had been closed since December 4, 2017, and there
were no funds in the account to honor the attempted ACH payments.

72.   According to Hanmi Bank records, **Suk**'s personal Hanmi Bank
checking account ending in 8573 ("Hanmi Bank 8573") was opened on
March 1, 2010, and was later closed on December 28, 2017. **Suk** was the
account holder and sole authorized signer on the account. **Suk**'s
listed address was the same as In Jung's listed address in Buena
Park, California.

73.   Between June 14, 2019 and June 20, 2019, Hanmi Bank 8573,
which had been closed since December 28, 2017, had 11 suspicious
attempted ACH credit card payments totaling $72,912 toward Chase Bank
and Citi Card. Hanmi Bank subsequently returned the ACH payments
because Hanmi Bank 8573 had been closed since December 28, 2017, and
there were no real funds in the account to honor the ACH payments.
Subsequently, Hanmi Bank's investigation revealed that the attempted
ACH payments were conducted on behalf of several individuals,
identified as Anna Hwang, Kang Young Lee, and Golden Green Mountain
Incorporated. The relationship between **Suk** and those individuals is
currently unknown. However, I believe that **Suk** was using this closed
account to make NSF payments to effectuate the bust-out fraud he was
committing.

19

74.   Between August 20, 2019 and November 12, 2019, Hanmi Bank
8573 had 10 additional suspicious attempted ACH credit card payments
totaling $20,252 toward Discovery Card, State Farm Bank, Bank of
America, Nordstrom, and Phillips 66. According to Hanmi Bank's
investigation, **Suk** and several individuals identified as Jungki Song,
Junho Kim, and James James as the responsible parties involved in the
attempted ACH payments against Hanmi Bank 8573. Hanmi Bank
subsequently returned the ACH payments because the account had been
closed since December 28, 2017 and there were no funds in the account
to honor the ACH payments. Again, I believe that **Suk** was using this
closed account to make NSF payments to effectuate the bust-out fraud
he was committing.

75.   **Suk**'s personal bank account at Bank of Hope was also used
for similar fraudulent activity. For example, according to Bank of
Hope records, **Suk**'s personal checking account ending in 3364 ("BOH
3364") was opened on December 5, 2017. On August 18, 2019, the bank
forced closed BOH 3364 because the account had repeated ACH payments
to credit card companies against his insufficient account balance.

76.   As an illustration, between July 30, 2019 and August 7,
2019, BOH 3364 had three repeated attempts of ACH payments to credit
card companies, each totaling $16,000, against an insufficient
account balance. The ACH transfers were payable to **Suk**'s Citi Credit
card and several Citi Credit cards that belonged to Dohan Oh, Junko
Kim, and Jungil Lee.

77.   Subsequently on August 2, 2019 and August 7, 2019, the same
suspicious ACH credit card payments, each totaling $16,000, were
attempted against BOH 3364's insufficient account balance. The

payments were again returned due to non-sufficient funds, and penalties were applied to BOH 3364.

78.  On August 8, 2019, Bank of Hope sent a letter to **TARGET RESIDENCE 1** concerning BOH 3364. In this letter, Bank of Hope advised **Suk** of the following: "We have noticed that your account has not been in good standing as follows: Frequent overdrawn balances. Your continued activities will result in our forcible closure of your account. Therefore, we hereby request you bring your account into good standing or close your account voluntarily within 15 days from the date of this notice."

79.  On August 15, 2019, Bank of Hope sent a second letter to **TARGET RESIDENCE 1** advising **Suk** that the bank forced closed BOH 3364. The letter stated: "We have noticed that your account activities have not improved, as indicated below: Frequent overdrawn balances. As previously stated, we have closed your account on August 15, 2019."

   **g.    Cho, TARGET RESIDENCE 2, and TARGET VEHICLE 1**

80.  From June 2020 to October 2020, at the direction of the FBI, CS1 purchased, for cash, a total of $216,800 in black-market prepaid cards from **Cho** at a 10 percent discount.

81.  For example, on June 29, 2020, CS1 met with **Cho** and purchased, for cash, black-market prepaid cards. They met inside CS1's vehicle to conduct their transaction. During the meeting, CS1 took a photograph of the California license plate (with tag number 8HGS857) that was attached to **TARGET VEHICLE 1** and that **Cho** drove to meet with CS1. On June 30, 2020, CS1 provided the photograph of the tag number to me. According to NCIC, the tag number returned to a vehicle leased to Hyun Jin Choi at 1038 South Mariposa Avenue,

Apartment 402, Los Angeles, California. The relationship between **Cho** and Choi is currently unknown.

82.   At the direction of the FBI, CS1 engaged in the following controlled purchases of black-market prepaid cards from **Cho**:

   a.   On July 10, 2020, CS1 met with **Cho** in CS1's vehicle and purchased, for cash, $12,000 in black-market prepaid cards.

   b.   On July 13, 2020, CS1 met with **Cho** and purchased, for cash, $7,000 Costco black-market prepaid cards.

   c.   On July 22, 2020, CS1 met with **Cho** and purchased, for cash, $15,100 Visa black-market prepaid cards.

   d.   On July 29, 2020, CS1 met with **Cho** and purchased, for cash, $17,000 Visa black-market prepaid cards.

   e.   On August 2, 2020, CS1 met with **Cho** and purchased, for cash, $41,000 in Visa black-market prepaid cards.

83.   According to CS1's text message to me, on August 4, 2020, CS1 purchased, for cash, $28,000 Costco black-market prepaid cards and $12,000 Visa black-market prepaid cards at a 10 percent discount. CS1 also sent me photographs of the Costco and Visa black-market prepaid cards that he purchased from **Cho**.

84.   On August 16, 2020, CS1 met with **Cho** to purchase, for cash, $6,000 in Visa black-market prepaid cards. CS1 also provided photographs to me of the black-market prepaid cards he purchased from **Cho**.

85.   On October 10, 2020, at the direction of the FBI, CS1 engaged in a consensually-recorded phone call with **Cho**, who was using **Cho**'s 0125 phone. During that call, **Cho** told CS1 "I have $10,000 in Costco cards that I bought," referring to black-market prepaid cards.

22

**Cho** stated that he wanted to meet with CS1 on October 11, 2020 to sell the black-market prepaid cards.

86.  On October 11, 2020, during a consensually-recorded phone call, CS1 asked **Cho** "Why are you, a young person, still sleeping at this late hour in the morning?" **Cho** stated that he was up late and did not hear CS1 phone ring. CS1 told **Cho** to meet him near a church to conduct the prepaid card transaction. **Cho** stated that he was on his way to meet CS1.

87.  On October 16, 2020, during a consensually-recorded phone call, **Cho** used **Cho**'s 0125 number to call CS1 and told CS1 "I have some cards," referring to black-market prepaid cards that **Cho** would sell to CS1.

88.  On October 18, 2020, **Cho** used **Cho**'s 0125 phone to call CS1. During the consensually-recorded call, **Cho** said "Let's meet at 6:00 pm at Coffee Beans." That day, CS1 received a text message from **Cho**'s 0125 number. The message stated "I have $11,000. I'll be there by 6:00 pm," referring to Coffee Beans.

89.  On October 19, 2020, CS1 sent me photographs via text message of the black-market prepaid cards he purchased from **Cho**. The photographs showed three Costco black-market prepaid cards (each reflecting a face value of $1,000) and 15 Visa black-market prepaid cards.

90.  According to a Costco purchase receipt dated October 16, 2020 that **Cho** provided to CS1, the Costco black-market prepaid cards were each $1,000 in face value. According to an Albertsons purchase receipt from **Cho** that CS1 provided to me, the Visa black-market prepaid cards were purchased on October 16, 2020 and October 17, 2020. Both receipts from Costco and Albertsons showed that the black-

market prepaid cards had a face value of $11,000 in total, confirming what **Cho** promised CS1 when he texted CS1 "I have $11,000. I'll be there by 6:00 pm."

91.   December 28, 2020, using cell-site stimulator data, FBI surveillance agents located **Cho**'s 0125 phone that was pinging from an apartment complex called "Lamk Villa" at 908 Ardmore Avenue, Los Angeles, California. From December 2020 to April 2021, **Cho**'s 0125 phone continued to ping from "Lamk Villa" apartment complex.

92.   On February 12, 2021, CS1 told me that **Cho** owned a chicken and beer restaurant called "Town Hof and Thanks Chicken" in Koreatown at 1144 South Western Avenue, Los Angeles, California.

93.   On February 26, 2021, using cell-site stimulator data, I located **Cho**'s 0125 phone pinging from a casino, Harrah's Resort in Funner, California. Over the following several hours, I tracked the movement of the pings emitting from **Cho**'s 0125 phone from the casino to "Lamk Villa" apartment complex. While conducting surveillance, I saw **TARGET VEHICLE 1** arrive in front of the parking garage gate at "Lamk Villa" and wait for the gate to open. I then saw the driver of **TARGET VEHICLE 1** was an Asian male with black hair.

94.   On March 26, 2021, CS1 positively identified **Cho** from the California driver license photograph of **Cho. Cho** had black hair in the DMV photograph, which was taken in August 2017. CS1 said the man in the photograph, depicting **Cho**, went by the name "Sean," and was the same individual who sold him black-market prepaid cards over the years.

95.   On April 2, 2021, **Cho**'s identifying information was searched in a law enforcement database, which revealed a Los Angeles Police Department ("LAPD") report of **Cho**'s arrest for grand auto

theft on September 26, 2013. The LAPD report revealed that **Cho**, when arrested, used the alias name "**Shawn Cho Robert**" at the time of his arrest.

96.  Around April 23, 2021, **Cho**'s 0125 phone stopped pinging from the "Lamk Villa" apartment complex. Instead, the pings began coming from the vicinity of another nearby apartment complex at 1138 South Serrano Avenue, Los Angeles, California, which is the complex of **TARGET RESIDENCE 2** (the "**TARGET RESIDENCE 2** complex").

97.  On April 26, 2021, using the cell-site simulator data, FBI surveillance agents found that **Cho**'s 0125 phone was pinging from the vicinity of the **TARGET RESIDENCE 2** complex. **Cho**'s 0125 phone continued to ping from this location until the court-authorized ping expired on May 7, 2021.

98.  On May 3, 2021, I located **TARGET VEHICLE 1** parked in front of **Cho**'s restaurant, "Town Hof and Thanks Chicken." I saw **Cho** exit the restaurant and get into **TARGET VEHICLE 1. Cho** drove **TARGET VEHICLE 1** for a short distance to the **TARGET RESIDENCE 2** complex and entered the parking garage.

99.  According to AT&T phone records that I reviewed, on June 19, 2021, **Cho**'s 0125 phone called CS1's cell phone. On September 7, 2021, during my meeting with CS1, CS1 reported to me that around middle of June 2021, CS1 received a phone call from **Cho**, who was using **Cho**'s 0125 phone. According to CS1, during that call, **Cho** asked CS1 why CS1 was not buying black-market prepaid cards from **Cho**. CS1 said he told **Cho** that he was not buying black-market prepaid cards at the moment. CS1 told me that he believed **Cho** did not like dealing with the people who were buying his black-market prepaid cards because they were probably not paying him at the time of sale (and

instead were buying **Cho**'s black-market prepaid cards on consignment). CS1 always paid cash up-front and did not check the black-market prepaid cards for their loaded value because he trusted that **Cho** would not scam him, which **Cho** appreciated.

100. On September 16, 2021, I saw **TARGET VEHICLE 1** parked in front of **Cho**'s restaurant, "Town Hof and Thanks Chicken." **Cho** was sitting in the driver's seat of **TARGET VEHICLE 1**. **Cho** then drove **TARGET VEHICLE 1** to the **TARGET RESIDENCE 2** complex and entered the parking garage. I then went inside the parking garage of the **TARGET RESIDENCE 2** complex and located **TARGET VEHICLE 1** parked in the far end of the garage, next to parking space number eight, which was occupied with a 2012 Silver Nissan Cube, California license plate 6WPG830.

101. According to NCIC, the Nissan Cube was registered to Hyunhee Baik ("Baik") and her California DMV license showed that her home address was at 908 South Ardmore Avenue, Unit 305, Los Angeles, California which is the address for "Lamk Villa."

102. According to Lexus Nexus, from October 2017 to July 2021, Baik lived at the "Lamk Villa" in Unit 305. Moreover, according to Lexus Nexus, since June 2021, Baik has been living at **TARGET RESIDENCE 2,** specifically in Unit 202.

103. On September 29, 2021, CS1 positively identified the DMV photograph of Baik as **Cho**'s longtime girlfriend. CS1 also told me that Baik did several errands for **Cho** in the past. For instance, according to CS1, Baik delivered black-market prepaid cards to CS1 that CS1 purchased from **Cho**.

104. I therefore believe that **Cho** lives with Baik at **TARGET RESIDENCE 2**. **Cho** is also the driver of **TARGET VEHICLE 1** parked next to Baik's Nissan Cube in the parking garage of **TARGET RESIDENCE 2**.

**h.   Kim, TARGET RESIDENCE 3, and TARGET VEHICLE 2**

105. At the direction of the FBI, CS1 and CS2, working independently of each other, engaged with **Kim** to report on **Kim**'s criminal activities to me.

106. On July 8, 2020, CS1 met with **Kim** at **TARGET RESIDENCE 3**. Their meeting was consensually-recorded. CS1 said "so you're having problem getting cards?" **Kim** replied "they are not coming in. Look at the current situation? The banks are closed." CS1 said "if you get some cards, I'm willing to pay you 5 percent." **Kim** replied "no, I will buy them from you!"

107. I believe that in the above conversation, CS1 asked **Kim** if he was having trouble buying black-market prepaid cards ("so you're having problem getting cards"). **Kim** then complained that there was a shortage of the black-market prepaid cards because his fraudsters were not bringing him enough cards to buy ("They are not coming in"). **Kim** stated that the likely cause was the Covid-19 pandemic shut down ("Look at the current situation. The banks are closed"). CS1 then told **Kim** that he was willing to buy **Kim**'s black-market prepaid cards even at a five percent discount versus the 10 percent discount he normally got from his fraudsters ("If you get some cards, I'm willing to pay you 5 percent"). **Kim** jokingly said that he would instead buy them from CS1 ("no, I will buy them from you").

108. During the same meeting on July 8, 2020, **Kim** and CS1 talked about a bust-out fraudster named "James," though according to CS1, they were not referring to **Suk** (who also uses this alias). CS1 asked

**Kim** "by the way, does James still work?" **Kim** replied "that bastard ripped his customer, so his customer posted on Radio Korea that James was a fraudster." CS1 asked "if he is still working, then how does he handle his cards?" **Kim** replied "he probably swipes them on merchant machines, instead. I heard that he had a lot of merchant machines in his house, but I don't think that arrangement is working out for him these days." CS1 asked "why do you say that?" **Kim** replied "because he swiped too many times and he got a lot of chargebacks." CS1 stated "that will kill it." **Kim** responded "yes, the card will die along with the merchant machine."

109. I believe in the above conversation, CS1 and **Kim** were talking about another bust-out fraudsters they both knew as "James." CS1 asked **Kim** if James was still in the business of selling black-market prepaid cards ("by the way, does James still work"). **Kim** replied that James defrauded his customer by not paying the customer the cash that James helped convert from the customer's credit card limit ("that bastard ripped his customer, so his customer posted on Radio Korea that James was a fraudster").

110. CS1 then asked **Kim** how James was busting-out credit cards if he has no customers ("If he is still working, how he handles his cards"). **Kim** said he heard James was busting-out credit cards by swiping them on merchant machines that James had in his house, meaning machines that James acquired fraudulently ("he swipes them on merchant machines he has in his house"). **Kim** said this bust-out scheme was not working out for James because he swiped the credit cards too many times causing chargebacks to add up on the merchant machines ("because he swiped too many times and he got a lot of chargebacks"). CS1 told **Kim** those aggressive swipes would cause the

28

merchant machine to shut down ("that will kill it") and **Kim** agreed with CS1 ("yes, the card will die and the merchant machine will also die as well").

111. On July 8, 2020, during CS1's meeting with **Kim** at **TARGET RESIDENCE 3**, CS1 observed **Kim**'s vehicle, a GMC Yukon with a California license plate bearing tag number 5MGK752, which is **TARGET VEHICLE 2**. According to NCIC, **TARGET VEHICLE 2** was registered to **Kim** at the address of **TARGET RESIDENCE 3.**

112. Bank of Hope records show that **Kim**'s Bank of Hope business checking account ending in 1225, titled "American Pacific Supply Inc.," was associated with an address at 137 East 3rd Street, Los Angeles, California. The signers on the account were **Kim** and his wife, Sung Hee.

113. On December 1, 2020, I spoke with a Sprint PCS representative who advised me that **Kim**'s 6995 number was carried by Sprint PCS, and had been carried by Sprint since June 30, 2019. I also learned from business records that **Kim**'s 6995 phone bills were paid for by Sung Hee, **Kim**'s wife, with an address at **TARGET RESIDENCE 3.**

114. On December 3, 2020, FBI conducted surveillance at 137 East 3rd Street, Los Angeles, California, associated with **Kim**'s business, American Pacific Supply. The location of the address was a wholesale cigarette store with a business sign "City Wide Supplies, Wholesale Cigarette."

115. On December 4, 2020, at the direction of the FBI, CS2 made a phone call to **Kim**'s 6995 number to find out whether **Kim** was interested in buying black-market prepaid cards from a bust-out fraudster. The call was consensually-recorded. During the call, CS2

29

introduced himself to **Kim** as "Jay" and said that several years ago he received **Kim**'s 6995 number from someone who said that **Kim** was buying prepaid cards. CS2 told **Kim** that he was a professional credit card bust-out fraudster and was currently out of town buying black-market prepaid cards. **Kim** expressed interest in buying as much as $100,000 in black-market prepaid cards from CS2 at a 10 percent discount. CS2 said that he would initially sell to **Kim** several thousand dollars of black-market prepaid cards. CS2 said he would contact **Kim** within two weeks when he returned to town.

116. Subsequently, on December 17, 2020, at the direction of the FBI, CS2 conducted a controlled sale of prepaid cards to **Kim**, who believed he was buying black-market prepaid cards from CS2 (when in fact those cards were loaded with FBI operational funds). The meeting was consensually-recorded. CS2's directions from the FBI were to sell $4,500 in purported black-market prepaid cards to **Kim** at a discount, but due to an unforeseen issue regarding the loaded amount on one of the prepaid cards, CS2 only sold one $500 prepaid card to **Kim**. CS2 conducted the controlled sale with **Kim** inside **TARGET VEHICLE 2** that was parked at a Starbucks parking lot in Koreatown in Los Angeles. CS2 told **Kim** that he would verify the rest of the prepaid cards to ensure proper amounts were loaded and set up another time to sell the rest of the prepaid cards to **Kim**. **Kim** agreed.

117. On December 28, 2020, using cell-site simulator data, FBI surveillance agents located **Kim**'s 6995 phone pinging from **TARGET RESIDENCE 3**. **Kim**'s 6995 phone continued to ping from **TARGET RESIDENCE 3**

118. On December 30, 2020, according to the recordings, **Kim**'s 6995 phone called CS1. **Kim** asked CS1 to help him find the location

where they were meeting. CS1 told **Kim** to come to Bank of Hope location in Koreatown. CS1 reported to me that he introduced **Kim** to a business vendor who bought cigarettes from CS1 for many years. CS1 introduced **Kim** to the vendor since he could no longer buy prepaid cards to buy the cigarette (because CS1 was no longer authorized by the FBI to buy black-market prepaid cards). CS1 said he introduced **Kim** to the vendor as the new cigarette supplier.

119. On April 6, 2021, at the direction of the FBI, CS2 met with **Kim** once more inside **TARGET VEHICLE 2**, parked at the same Starbuck's parking lot. The meeting was consensually-recorded. CS2 met with **Kim** to complete the controlled sale of the remaining $4,000 in purported black-market prepaid cards to **Kim** (loaded with FBI operational funds) that CS2 was unable to sell to **Kim** in their initial meeting on December 17, 2020. **Kim** purchased the remaining prepaid cards with cash.

120. On June 22, 2021, CS1 reported to me that about a week prior, he received a phone call from **Kim**'s 6995 phone. CS1 told **Kim** that since CS1 was no longer competing with **Kim** to buy black-market prepaid cards, the fraudsters were probably bringing **Kim** plenty of prepaid cards for him to buy. However, **Kim** complained to CS1 that he was having trouble getting black-market prepaid cards from his fraudsters. CS1 told me that **Kim** usually called him to complain whenever **Kim** was not getting enough black-market prepaid cards from his fraudsters.

121. On September 14, 2021, at the direction of the FBI, CS2 made a phone call to **Kim** to find out if **Kim** was still in the business of buying black-market prepaid cards from bust-out fraudsters. The call was consensually-recorded. During the call, CS2 again identified

himself as Jay and asked **Kim** if he remembered him from several months earlier, referring to their April 6, 2021 meeting when CS2 sold **Kim** $4,000 in black-market prepaid cards. CS2 asked **Kim** if he was interested in purchasing more black-market prepaid cards and told **Kim** that CS2 could have them ready for **Kim** to buy in the next several weeks. **Kim** told CS2 "whatever you bring, I can do all of it. I don't know how much it is. Is it like over $300,000?" CS2 said "no, it's not that much. Right now, I have about $50,000." **Kim** said "yes."

122. On October 12, 2021, FBI surveillance observed **TARGET VEHICLE 2** driven, by **Kim**, pull into the driveway of **TARGET RESIDENCE 3**, therefore confirming that **Kim** continues to reside at **TARGET RESIDENCE 1**.

### i. Kim and his wife deposit cash derived from black-market prepaid cards into BOH account

123. According to Bank of Hope records, **Kim** and his wife, Sung Hee, signed a bank signature card on October 19, 2016 to open a business checking account ending in 1225 ("BOH 1225") titled "American Pacific Supply Incorporated." On July 30, 2021, BOH 1225 was closed. The bank signature card indicated that American Pacific Supply was a cigarette and tobacco wholesaler in Los Angeles with an address at 137 East 3rd Street, Los Angeles, California. This is the location of **Kim**'s cigarette store on the Third Street in downtown Los Angeles and displays the business sign "City Wide Supplies, Wholesale Cigarette."

124. From February 2020 to July 2021, BOH 1225 received a total of $1,616,890 in cash deposits. Each month, BOH 1225 received five to six separate cash deposits in the amount of $2,500 to $65,000.

125. As described above, CS1 told me that **Kim** purchases black-market prepaid cards at a discount, uses those black-market prepaid cards to buy wholesale quantities of cigarettes at Costco Warehouses, and then sells those cigarettes for a profit. Recorded conversations corroborate these statements from CS1.

126. I therefore believe that **Kim** is using black-market prepaid debit cards to purchase cigarettes, selling those cigarettes for cash, and then depositing the proceeds, which were derived from the black-market prepaid cards in the first instance, into BOH 1225.

## TRAINING AND EXPERIENCE ON PREPAID CARDS

127. I know that black-market prepaid cards are linked to a credit card payment system, such as Visa or MasterCard, and bear their logos, but operate as debit cards. That is, someone first has to prepay the balance, often $1,000, that is assigned to the card or it cannot be used to make purchases.

128. Since the card is prepaid, there is no credit check to obtain the card. Nor need the prepaid card be registered to a particular person. Thus, prepaid cards can function anonymously, like cash. Because the card can be used anywhere its payment system (e.g., Visa and MasterCard) is accepted, the prepaid card has some of the advantages of a credit card: it is physically small relative to its purchasing power, can give its user the appearance of credit-worthiness, and it does not generate Currency Transaction Reports.

129. Prepaid cards are popular among criminals because of their anonymity and because they can be purchased with a credit card. Someone who wants to fraudulently deplete the credit limit of a credit card can normally obtain only a small fraction of the credit card's limit as a cash advance. Therefore, more sophisticated

33

criminals, such as bust-out fraudsters, use credit cards to purchase prepaid cards, then use the prepaid cards anonymously or sell them to others on the black market.

## TRAINING AND EXPERIENCE ON EVIDENCE OF FRAUD

130. Based on my knowledge, training, and experience, and through discussions with investigators experienced in similar investigations, I know that:

131. Individuals, including those involved in fraud and financial-related crimes, commonly maintain records and documents. The records are necessary for the individual to track their income and expenses, manage their cash flow and assets, track their investments, pay their monthly bills, and comply with certain federal and state laws. Additionally, individuals involved in fraud and financial-related crimes often maintain records and documents pertaining to their criminal activity and records and documents pertaining to the use and disposition of proceeds obtained through the scheme.

132. Individuals commonly retain such records at their residences, workplaces, vehicles, and other locations under their custody or control. I know based on my training and experience that individuals may store such records and documents in a number of locations, including on their persons (such as a bank receipt or debit card kept in a wallet), in containers in their possession (such as a purse, a locked/unlocked safe, or bank safe deposit box), in their homes (particularly when that home address is the address for an associated financial account), and in their vehicles (used as a place to meet with their customers to conduct black-market prepaid

cards transactions that would involve prepaid card purchase receipts and other related documents might be stored).

133. This evidence can take many forms, and may include receipts, account opening documents, debit cards, checkbooks, account statements, and other paper records. Moreover, this evidence is often stored in hard-copy and digital form, such as on a cell phone, computer, external hard drive or USB drive, or remotely, such as in an email account or remote storage (e.g., cloud) account.

134. Individuals involved in fraud and financial-related crimes often maintain records for a long period of time, particularly when they are involved in ongoing criminal conduct for the following reasons:

a.   To the offender, the evidence may seem innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes and public storage, packaging materials, computer hardware and software). However, to law enforcement, such items may have significance and relevance when considered in light of other evidence.

b.   The criminal offender may no longer realize they still possesses the evidence or may believe law enforcement could not obtain a search warrant to seize the evidence. The criminal offender may also be under the mistaken belief that they have deleted, hidden, or further destroyed evidence, such as computer-related evidence,

which in fact the evidence may be retrievable by a trained computer forensic expert.

    c.   Criminal offenders may also retain those records, in digital and hardcopy format, when moving from one residence to another residence.

    d.   More sophisticated criminals often store some of the tools of their trade away from their homes, often in public storage units or safety deposit boxes. By doing so, they make it harder for law enforcement, or other criminals, to locate them. Criminals who deal in large sums of cash are vulnerable not just to arrest, but to robbery by other criminals. Accordingly, they often seek to safely store their valuables, as well as records and tools of their trade to which they do not need daily access, in safety deposit boxes or public storage units.

135. Finally, I know that individuals who are engage in fraud or money laundering as their primary or sole source of income are likely to continue to engage in that criminal conduct, absent an intervening factor, such as an arrest. Even after contact with law enforcement, such criminal offenders often continue to engage in fraud or money laundering offenses.

136. I know that smaller digital devices, such as cellular phones, tablet computers, or removable media, are often carried by individuals on their persons or in bags within their possession, or stored in a home or in a vehicle. Laptop computers are often stored in the home or in a portable bag, while desktop computers are primarily found in homes. These types of digital devices are likely to be located at the **TARGET RESIDENCES** at the time of the execution of the search warrant requested here, either because that is where

36

they are primarily stored (as in the case of desktop computers) or because the targets are anticipated to be at the **TARGET RESIDENCES** at the time of the execution of the search warrant. Moreover, digital devices, including phones, tablets, and laptops which are often located in fraudsters' cars, such as the **TARGET VEHICLES.**

137. Finally, I know that with respect to investigations involving evidence obtained from email accounts, cloud storage accounts and digital devices, that identity is a defense that is sometimes raised. Thus, establishing the identity of the persons who has dominion and control of, and access to, a digital device that is seized may be important. This is particularly true in the present case, where subjects of the investigation have used multiple "handles" or monikers when communicating through electronic means. It is possible that digital devices may be registered in false names or may be used by multiple people. Investigators sometimes therefore have to rely on circumstantial evidence to show that an individual was the actual user of a particular digital device. When multiple persons share a residence, investigators may have to piece together information contained in the contents of a digital device to establish who the actual user of a digital device was.

## TRAINING AND EXPERIENCE ON DIGITAL DEVICES[7]

138. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

139. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear, rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

140. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and

---

[7] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units, desktop, laptop, notebook, and tablet computers, personal digital assistants, wireless communication devices, such as paging devices, mobile telephones, and smart phones, digital cameras, gaming consoles, peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives, related communications devices, such as modems, routers, cables, and connections, storage media, and security devices.

materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files, recently used tasks and processes, online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs, attachment of other devices, times the device was in use, and file creation dates and sequence.

141. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

142. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

143. Based on my training, experiences, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

144. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to

maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

145. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

146. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

147. User may enable a biometric unlock function on some digital devices. To us this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one that user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

148. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of

unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

149. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress **Suk, Cho,** or **Kim'**s thumbs and fingers on the device, and (2) hold the devices in front of **Suk, Cho,** or **Kim'**s face with their eyes open to activate the facial-iris and retina-recognition feature.

150. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## REQUEST FOR SEALING

151. Reasonable cause exists to seal the applications, warrants, and warrant returns associated with this affidavit, as well as to seal this affidavit itself. This investigation is ongoing, and to this point, has remained covert. Moreover, the investigation involves the use of a number of confidential sources whose physical safety, absent sealing, could be jeopardized. Thus, there is reason to believe that failing to seal the applications, affidavit, warrants, and warrant returns will result in (1) endangering the life or physical safety of an individual, (2) flight from prosecution, (3) destruction or alteration of evidence, (4) intimidation of potential witnesses, (5) otherwise seriously jeopardizing the investigation, or (6) unduly delaying trial.

## **CONCLUSION**

152. There is probable cause to issue the requested warrants.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by phone
on this _____ day of _____,
2021.

_____
HONORABLE ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

42